*Honorable David G. Estudillo*

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| RICHARD ARTHUR KIRKHAM, | ) | NO. C24-1625-DGE-SKV |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | VERIFIED AMENDED |
| | ) | §§ 1983 AND 1985 |
| CITY OF BELLINGHAM, et al., | ) | PRISONER CIVIL RIGHTS |
| Defendants. | ) | COMPLAINT WITH JURY DEMAND |
| | ) | |

## I. PLAINTIFF INFORMATION

Plaintiff Richard Kirkham was a non-incarcerated, private citizen during the initial events which gave rise to the § 1983 portions of this Complaint. The Plaintiff was a pretrial detainee in the Whatcom County Jail when he discovered the actions which gave rise to the § 1985 portions of this complaint, and he remains so as of this filing.

Richard Kirkham #136451
Interim Work Center
2030 Division Street
Bellingham, WA 98226

## II. DEFENDANT INFORMATION

All named Defendants are currently represented by the firm and attorneys named below:

Keating, Bucklin & McCormack, Inc., P.S.
Thomas P. Miller, WSBA #34473
Stuart Cassel, WSBA #49808
Attorneys for Defendants
1201 Third Avenue, Suite 1580
Seattle, WA 98101
Phone: (206) 623-8861
Fax:    (206) 223-9423

E-mail: tmiller@kbmlawyers.com
E-mail: scassel@kbmlawyers.com

**DEFENDANT 1: CITY OF BELLINGHAM**
    The City of Bellingham is a Washington State municipal corporation and is sued in that capacity.

**DEFENDANT 2: CHIEF REBECCA MERTZIG**
    Rebecca Mertzig was the Chief of Police of the Bellingham Police Department at all relevant times in this complaint, and is sued in her individual and official capacities.

**DEFENDANT 3: DEPUTY CHIEF DONALD ALMER**
    Donald Almer was the Deputy Chief of Police of the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

**DEFENDANT 4: SERGEANT JEREMY HARPER**
    Jeremy Harper was a Sergeant employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

**DEFENDANT 5: CORPORAL SHAUN NELSON**
    Shaun Nelson was a Corporal employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

**DEFENDANT 6: CORPORAL LUKE H. HAAS**
    Luke H. Haas was a Corporal employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

**DEFENDANT 7: K9 OFFICER JEREMY WOODWARD**
    Jeremy Woodward was a K9 Officer employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

**DEFENDANT 8: OFFICER KAIGE EDGAR**
    Kaige Edgar was an Officer employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

**DEFENDANT 9: OFFICER NICOLAS STURLAUGSON**
    Nicolas Sturlaugson was an Officer employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

**DEFENDANT 10: OFFICER STEVEN LONGBOTTOM**
    Steven Longbottom was an Officer employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

**DEFENDANT 11: OFFICER DHILLON JOBANDEEP**
    Dhillon Jobandeep was an Officer employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

**DEFENDANT 12: OFFICER AVERY LYONS**
Avery Lyons was an Officer employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

**DEFENDANT 13: OFFICER KEVIN BEAN**
Kevin Bean was an Officer employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

**DEFENDANT 14: OFFICER DAVID JOHNSON**
David Johnson was an Officer employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

## III. ADDITIONAL DEFENDANT INFORMATION

The Plaintiff is adding the following additional Defendants as part of his Amended Complaint. They are not as yet represented by counsel and require service of summons:

**DEFENDANT 15: OFFICER MICHAEL SHANNON**
Michael Shannon was an Officer employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in his individual and official capacities.

Michael Shannon
Bellingham Police Department
505 Grand Avenue
Bellingham, WA 98225

**DEFENDANT 16: DETECTIVE LISA ASPESSI**
Lisa Aspessi was a Detective employed by the Bellingham Police Department at all relevant times in this complaint, and is sued in her individual and official capacities.

Lisa Aspessi
Bellingham Police Department
505 Grand Avenue
Bellingham, WA 98225

**DEFENDANT 17: DEPUTY PROSECUTOR KELLEN B. KOOISTRA**
Kellen B. Kooistra was a Deputy Prosecuting Attorney employed by the Whatcom County Prosecuting Attorney's Office at all relevant times in this complaint, and is sued in his individual and official capacities.

Kellen B. Kooistra
Whatcom County Prosecuting Attorney
311 Grand Avenue, Suite 201
Bellingham, WA 98225

## IV. JURISDICTION

**4.1**  This Court has original jurisdiction over the Plaintiff's claims of federal constitutional rights violations under 42 U.S.C. § 1331.

**4.2**  This Court has supplemental jurisdiction over the Plaintiff's state law tort claims under 28 U.S.C. § 1367.

## V. COMPLIANCE WITH STATE LAW AND NOTICE TO COUNSEL

**5.1**  The Plaintiff filed a timely tort claim with Defendant City of Bellingham, as required by Revised Code of Washington (RCW) 4.96.020: Claim for Damages #2024-05.

**5.2**  On March 18, 2024, Defendant City of Bellingham denied the Plaintiff's Claim for Damages #2024-05.

**5.3**  On April 24, 2025, the Plaintiff mailed a second tort claim with Defendant City of Bellingham after discovering new information regarding Defendant(s) tampering with evidence.

**5.4**  On April 24, 2025, Plaintiff sent a true and correct copy of the second tort claim to attorneys for Defendants at the address above to ensure they were given notice of the additional claims.

**5.5**  The second tort claim was assigned Claim for Damages #2025-18, a was denied by the City of Bellingham on May 2, 2025.

## VI. INTRODUCTION

**6.1**  This is an Amended Complaint in a civil rights action, filed now pursuant to 42 U.S.C. §§ 1983 and 1985.

**6.2**  This Amended Complaint alleges violations of the Plaintiff's First, Fourth, and Fourteenth Amendment rights, conspiracy to deprive the Plaintiff of those rights, and various state law tort violations.

**6.3**  The causes of action arose from the Defendants' application of the following de facto and official policies of the City of Bellingham, which had the force of law at all relevant times in this Complaint:

　**1.** Bellingham Police Department's (BPD) unreasonable deployment of Special Weapons And Tactical (SWAT) Teams as a means to premeditatedly use excessive force against citizens;

　**2.** BPD's pattern and practice falsifying reports and altering video footage to conceal their premeditated crimes and misconduct, and;

　**3.** BPD's Body Worn Recording Device Policy 425, which creates the ungoverned and unsupervised opportunity for BPD Officers to alter videos from the devices they use in the line of duty prior to downloading them as evidence.

6.4  Employing the policies listed above at ¶6.3, Defendants continually conspired to unreasonably deploy SWAT against the Plaintiff with the intention of causing him harm or death and covering up their premeditated actions.

6.5  Defendants unreasonably deployed SWAT to arrest the Plaintiff while he was wearing a GPS ankle monitor, in full compliance with his court ordered conditions of release, pretrial probation, and address registration requirements, and was not a danger to anyone.

6.6  Defendants intentionally created danger by allowing the Plaintiff to drive to and enter his home, then cited that fact as necessitating SWAT deployment.

6.7  After Defendants manufactured the alleged dangerous situation, they found the Plaintiff on his knees, in plain view of the road, wearing the GPS ankle monitor, and posing no danger to anyone.

6.8  Defendants could have simply walked up and grabbed the Plaintiff or surrounded him without incident; instead they intentionally startled him to induce his flight response to create danger and unlawfully justify the use of force.

6.9  Defendants intentionally failed to identify as police, issue lawful commands, or tell the Plaintiff he was under arrest so they could avoid the possibility of his peaceful surrender.

6.10  Immediately after startling the Plaintiff, Defendants opened fire at his back, apprehended him, then walked him into his own back yard out of public view and attacked him with a K9 while he was not struggling or resisting.

6.11  The Plaintiff alleged all of these facts in his Initial Complaint and swore, under penalty of perjury, that Body Worn Camera (BWC) footage would prove his claims.

6.12  The Initial Complaint also alleged Defendants falsified police reports and interfered with Plaintiff's attempts to report their criminal assault to hospital staff.

6.13  The Plaintiff supported the facts in his Initial Complaint with police reports and other documents obtained through lawful public records requests.

6.14  As this case was pending the Plaintiff lawfully obtained additional public records supporting his claims, some providing evidence of additional efforts by named and as yet unnamed Defendants to unreasonably deploy SWAT against the Plaintiff prior to their successful deployment.

6.15  As this case was pending the Plaintiff was able to view some of the BWC footage from the date of his arrest by SWAT, and saw that it unquestionably proved his claims of excessive force.

6.16  The Plaintiff also discovered that portions of the BWC footage had been digitally altered by Defendants to create fake footage in an attempt to conceal their intentional criminal assault and battery of the Plaintiff.

**6.17** Even the altered, fake portions of the BWC footage prove the Plaintiff's claims of excessive force.

**6.18** The additional facts, not discoverable until after the Plaintiff filed his Initial Complaint, formed bases for adding additional Defendants and claims under 42 U.S.C. § 1985.

**6.19** The number of Defendants, factual complexity, and causes of action require the lengthy Amended Complaint which follows.

**6.20** The Plaintiff has done his best to plead the facts supporting his claims concisely in light of the newly discovered information.

## VII. FACTS RELEVANT TO CLAIMS

**7.1** The facts stated herein are supported by documentary evidence attached as exhibits grouped by date and/or relevance.

**7.2** All of the exhibits were obtained through public records requests unless otherwise stated.

**7.3** On information and belief, all of the documents contained in the exhibits are official documents and/or true and correct copies of what they are intended and stated to represent.

**7.4** The Plaintiff has been married to Roseleta Marie Kirkham (Rose) since 2016.

**7.5** The Plaintiff and Rose own the home located at 3130 Cedarwood Avenue, Bellingham, WA 98225, hereinafter "home."

**7.6** On March 22, 2023, Bellingham Police Department (BPD) officers responded to a 911 call from Rose at the Plaintiff's home.

**7.7** Rose claimed the Plaintiff assaulted her by choking her unconscious.

**7.8** Numerous BPD Officers responded and determined that Rose had not been assaulted. See EXHIBIT B-15 at ln. 6-10.

**7.9** This incident placed the BPD on notice that Rose will lie to cause trouble for the Plaintiff.

**7.10** On information and belief, the named BPD Defendants either responded to or were made aware of this incident during muster or by their coworkers.

**7.11** On June 26, 2023, numerous BPD Officers deployed to the Plaintiff's home hoping to locate him and arrest him on nonviolent warrants. See EXHIBIT A-3—A-10.

**7.12** Defendants Nelson, Sturlaugson, and Lyons were present. See EXHIBIT A-3 ¶1, A-6, A-9.

**7.13** Defendants Nelson, Stulausgon, and Lyons alleged they witnessed the Plaintiff flee into his home after reaching for his waistband. See EXHIBIT A-3—A-10.

**7.14** They had actually witnessed Rose flee into the home, as Rose and a witness informed them upon contact. See EXHIBIT A-3, A-5, A-10.

**7.15** On information and belief, Nelson, Sturlaugson, and Lyons fabricated the claim that they saw the Plaintiff reach to his waistband as part of their conspiracy to deploy SWAT to invade the Plaintiff's home and hurt him in violation of his rights against unreasonable seizures under the Fourth Amendment.

**7.16** On information and belief, SWAT deployment is the most serious and dangerous action a police department can take against a private citizen.

**7.17** On information and belief, per the BPD's de facto policy, which all BPD Officers including named Defendants are aware of, SWAT deployment is an opportunity to use military tactics and munitions violently against citizens regardless of whether or not such deployment is necessary or reasonable.

**7.18** On information and belief, two of the named BPD Defendants participated in the June 26, 2023, text conversation in EXHIBIT A-18, which the Plaintiff obtained through a public records request.

**7.19** EXHIBIT A-18 discusses deploying SWAT against the Plaintiff for the sole purpose of using dangerous police munitions and tactics against him, as evidenced by the statement:
   "It's close to the Fourth of July and I enjoy fireworks."

**7.20** On June 26, 2023, according to Defendant Nelson, BPD Officer Smith completed a threat assessment to determine if SWAT deployment was warranted and found it was not. See EXHIBIT A-4.

**7.21** As part of their conspiracy to employ unnecessary and excessive force against the Plaintiff by deploying SWAT, Defendants Nelson and Lyons altered Officer Smith's threat assessment. See EXHIBIT A-3—A-4, A-15—17.

**7.22** Both Defendants Nelson and Avery signed the altered threat assessment. See EXHIBIT A-17.

**7.23** Defendant Nelson was the commanding officer on scene and did not report why he and Lyons altered Officer Smith's threat assessment or how they added 9 points. See EXHIBIT A-4.

**7.24** Defendant Lyons made no mention in his report of his participation in altering the threat assessment. See EXHIBIT A-6.

**7.25** Defendant Nelson used his position as commanding officer on scene to attempt to further the Defendants' conspiracy to employ unnecessary and excessive force by asking SWAT

Commander Murphy to activate SWAT, who determined the circumstances were not appropriate. See EXHIBIT A-4.

**7.26** On information and belief, Defendant Nelson and Lyons knew based on their experience that the circumstances on June 26, 2023, did not warrant SWAT deployment, but they attempted to do so anyway to further their conspiracy to harm the Plaintiff.

**7.27** Defendants Nelson's and Lyons's claims that the Plaintiff reached towards his waistband are belied by their threat assessment, which awarded "0" points under Section III. Weapon Assessment, indicating they did not actually believe the Plaintiff was armed. See EXHIBIT A-16.

**7.28** After several hours of being harassed and hounded by Defendants Nelson, Sturlaugson, Lyons, and other BPD Officer, Rose had to contact her attorney Rachel Pollard, who in turn had to call their Superiors to make them leave the property and stop harassing her.

**7.29** After several hours of wasting BPD and taxpayer resources on their wild goose chase, and following their failed conspiracy to deploy SWAT, Defendants cleared the scene. See EXHIBIT A-4.

**7.30** As BPD cleared the scene in front of the Plaintiff's home, BPD Officer Bussdieker reported that he told Rose to call them if the Plaintiff "showed up," indicating that Nelson's, Sturlaugson's, and Lyons's fellow officers believed they had mistakenly identified Rose as the Plaintiff. See EXHIBIT A-5.

**7.31** The Plaintiff was never determined to have been at the home during the incident, despite continued surveillance. See EXHIBIT A-4, A-10, A-14

**7.32** On information and belief, Defendants Nelson, Sturlaugson, and Lyons were embarrassed by their incompetence and mistaken identification of Rose on June 26, 2023, and this made them angry at the Plaintiff, and Nelson personally requested an expedited arrest warrant for the Plaintiff the following day in retaliation, and to again seek an unreasonable SWAT deployment per BPD's de facto policy. SEE EXHIBIT B-19

**7.33** On July 7, 2023, the Plaintiff was picked up in Snohomish County on the warrants BPD had attempted to execute on June 26, 2023, and he posted bail after several days in custody.

**7.34** The Plaintiff took steps to get into and stay in compliance with all his criminal legal requirements, including voluntarily wearing a GPS ankle monitor, calling the Whatcom County Sheriff's Office to register his address, reporting to pretrial probation weekly, passing his urine analysis (AU) tests, and making all his court dates even when he knew he would be arrested. See EXHIBIT B-3—B-6, B-16—B-18.

**7.35** On information and belief, Defendant Aspessi was acutely aware of the Plaintiff's compliance with authority and his criminal legal requirements following his July 7, 2023, arrest as she was the lead Detective in several of Plaintiff's criminal matters.

**7.36** On July 20, 2023, the Plaintiff showed up for court and was arrested on new charges Aspessi had filed an affidavit of probable cause (PC) for. See EXHIBIT B-3.

**7.37** A reasonable inference can be drawn that Aspessi was notified that the Plaintiff had appeared in court and was subsequently arrested.

**7.38** After his arrest on July 20, 2023, the Plaintiff posted bail again was back in full compliance, reporting to pretrial probation, court, and voluntarily wearing a GPS ankle monitor. See EXHIBIT B-16.

**7.39** Had the Plaintiff not been in compliance, a warrant would have issued. See EXHIBIT B-6.

**7.40** On July 26, 2023, Aspessi reported her confidence that the Plaintiff could be arrested on new charges when he showed up at the Sheriff's Office or his next court date. See EXHIBIT A-1—2.

**7.41** Aspessi continued to charge the Plaintiff on a piecemeal basis to continue to keep placing bail on him and keep him in custody. See EXHIBIT B-18.

**7.42** A reasonable inference can be drawn that Aspessi continued to monitor the Plaintiff's compliance with authority and his criminal legal requirements following his arrests and posting of bail on the charges she was continually filing.

**7.43** On July 20, 2023, Sheryl Cartwright, a City of Bellingham employee, described in an email that Defendant Haas had called the Whatcom County Prosecutor, Eric Richey, and requested a "SWAT callout" to arrest the Plaintiff for alleged passing within 1,000 feet of a restricted residence while wearing his GPS ankle monitor. See EXHIBIT B-4—B-5.

**7.44** During the incident in question, the Plaintiff accidentally drove within a restricted zone for approximately 3 seconds, he was immediately reached on his cellphone and spoke with the GPS monitoring company about the mistake within minute of it occurring, and was not a threat to anyone. Reported under BPD Incident #23B43408. See EXHIBIT B-4.

**7.45** Eric Richey told Hass that it would be better to have the Plaintiff dealt with when he showed up to court the next day. See EXHIBIT B-4.

**7.46** The difference between Richey's response and Hass's response to the innocuous violation is further evidence of BPD's "SWAT happy" attitude, a futher shows the de facto policy within the BPD of deploying SWAT in unnecessary situations.

**7.47** Defendant Kooistra was an active part of the email chain, and said he had spoken with Defendant Haas. See EXHIBIT B-3—B-6.

**7.48** It is reasonable to infer that both the fist attempt on June, 26 2023, and the second attempt on July 20, 2023, to deploy SWAT to arrest the Plaintiff without justification were discussed among BPD employees, including all named Defendants.

**7.49** As Commanding Officers of the BPD, Defendants Mertzig and Almer either new about their subordinates' two unreasonable attempts to deploy SWAT in two months, or they were negligent in their supervisory responsibilities.

**7.50** In conformity with the BPD's de facto policy of unreasonably deploying SWAT, neither Mertzig nor Almer took steps to ensure their subordinates were properly trained on what circumstances warrant a SWAT response, and their failure to do so proximately caused the injuries the Plaintiff suffered on September 28, 2023.

**7.51** Eric Richey's response to Haas, known to all BPD Defendants and Defendant Kooistra, informed everyone involved that, according to the top law enforcement official in Bellingham and Whatcom County, the Plaintiff could be relied on to show up to court. See EXHIBIT B-4.

**7.52** Eric Richey's professional opinion was confirmed for everyone when the Plaintiff did show up for court and was taken into custody without incident. See EXHIBIT B-4.

**7.53** Kooistra continued to discuss ways to keep the Plaintiff incarcerated with Haas, and was informed by BPD employee Cartwright that, if released, the Plaintiff would have a GPS ankle monitor on. See EXHIBIT B-3—B6.

**7.54** Following his arrest on July 20, 2023, the Plaintiff eventually posted bail again and continued to remain in full compliance, reporting to pretrial probation, passing his UAs, showing up for court hearings, and voluntarily wearing his GPS ankle monitor.

**7.55** All named Defendants were aware of the Plaintiff's compliance.

**7.56** The Plaintiff remained in compliance and continued to wear his ankle monitor until his arrest on September 28, 2023.

**7.57** On or about September 25, 2023, the Plaintiff had posted bail, was released from Whatcom County Jail, and went voluntarily, without escort, to Friendship Diversion Services (FDS) in Bellingham to have a GPS ankle monitor put in place, and Defendants were aware of this or had access to this information.

**7.58** On or about September 26, 2023, the Plaintiff went voluntarily, without escort, to the Whatcom County Sheriff's Office to update his housing registration, and all Defendants were aware of this or had access to this information.

**7.59** On or about September 26, 2023, the Plaintiff went voluntarily, without escort, to pretrial probation services at the Whatcom County Public Safety building to provide a UA, which was negative for controlled substances, and all Defendants were aware of this or had access to this information.

**7.60**  On September 27, 2023, Rose again alleged to BPD that the Plaintiff assaulted her by choking her unconscious, which was identical to the allegation BPD had determined to be false on March 22, 2023. See herein above at ¶7.6—7.11.

**7.61**  BPD Officer Potts took Rose's report over the phone and did not verify her alleged injuries. See EXHIBIT B-8.

**7.62**  Potts reported Rose's voice was hoarse, but Potts had never before spoken to Rose and did not know her natural speaking voice. See EXHIBIT B-8.

**7.63**  Potts reported that Rose was in a safe place. See EXHIBIT B-8.

**7.64**  Potts reported that Rose alleged the Plaintiff said he was going to cut the GPS ankle monitor off, and Defendants Aspessi, Mertzig, Almer, and Kooistra were made aware of this claim by Potts's report.

**7.65**  Defendant Aspessi used Potts's report to generate PC for the Plaintiff's arrest. See EXHIBIT C-32.

**7.66**  Aspessi made no attempt to verify Rose's alleged injuries despite knowing Rose had been found by BPD to make false allegations against the Plaintiff, and that the Plaintiff had not cut off his GPS ankle monitor.

**7.67** Once she was made aware of the opportunity to arrest the Plaintiff, Aspessi communicated with Defendants Mertzig, Almer, and Harper to initiate the conspiracy to unreasonably and unnecessarily deploy SWAT against the Plaintiff with the intention of causing him grievous bodily injury or death.

**7.68**  On September 28, 2023, Defendant Aspessi verified that Rose's claim the Plaintiff was going to cut off the GPS ankle monitor was false, and informed all other named Defendants that the Plaintiff was still wearing his GPS ankle monitor. See EXHIBIT C-1, C-6, C-18—19, C-21, C-23, C-27, C-28.

**7.69**  This fact indicated that the Plaintiff was not a flight risk and that Rose's allegations were dubious at best, and a reasonably prudent officer would have taken additional steps before determining that a SWAT response was appropriate given the totality of the circumstances.

**7.70**  Defendant Aspessi conspired with Defendant Kooistra to get a rush warrant and deploy SWAT to arrest the Plaintiff without consulting Eric Richey, knowing that Richey would not approve of SWAT deployment. See EXHIBIT B-9.

**7.71**  On information and belief, EXHIBIT B-9 is a text message between Aspessi and Kooistra from September 28, 2023.

**7.72**  Kooistra knew that Aspessi's reason for the rush warrant was to unreasonably activate SWAT to arrest the Plaintiff, and his failure to consult his supervisor Eric Richey, whom he knew would not approve SWAT deployment, furthered his part in the conspiracy with BPD to violate the Plaintiff's Fourth Amendment rights, and was negligent, and proximately caused the Plaintiff's injuries.

**7.73**  Aspessi conspired with Defendant Harper to delay the immediate arrest of the Plaintiff while he was in a location apprehension would have been safe without SWAT, and encouraged Harper to push for SWAT deployment, which furthered her part in the conspiracy to violate the Plaintiff's Fourth Amendment rights, and was negligent, and proximately caused the Plaintiff's injuries. See EXHIBIT C-28, C-32.

**7.74**  Aspessi's actions in requesting a rush warrant and encouraging SWAT deployment are further evidence of BPD's de facto policy of unreasonably deploying SWAT, which had the force of law on September 28, 2023, and was the cause of Plaintiff's injuries.

**7.75**  Harper's recommendation to deploy SWAT to arrest the Plaintiff after being fully advised by Aspessi was unreasonable and negligent, and is further evidence of the BPD's de facto policy of unreasonably deploying SWAT in violation of the Fourth Amendment.

**7.76**  Harper's recommendation to deploy SWAT furthered his part in the conspiracy to violate the Plaintiff's Fourth Amendment rights.

**7.77**  On September 28, 2023, Aspessi negligently initiated the deployment of SWAT, by first enlisting Kooistra in the conspiracy and not discussing her intention with Richey, and then enlisting Harper in the conspiracy, thereby proximately causing the Plaintiff's injuries. See EXHIBIT C-28, C-32.

**7.78**  Aspessi intentionally left out of her report the facts she; had requested a rush warrant from Kooistra; had not communicated with Richey, and; had enlisted Harper to seek SWAT deployment, so she could avoid accountability for her part in the conspiracy to violate the Plaintiff's Fourth Amendment rights. See EXHIBIT C-32.

**7.79**  On September 28, 2023, the Plaintiff was parked in his RV in the Silver Reef Casino parking lot's RV section, where he had stayed over night.

**7.80**  Defendants intentionally left out of all their BPD reports from the incident the time of the morning they located the Plaintiff at the parking lot and began surveiling him, so they could make the false claim they did not have resources to arrest him while he was in the parking lot, and thereby attempt to justify SWAT deployment at his home. See EXHIBIT C-1—C-35.

**7.81**  BPD Officer Allen's report indicates Defendants surveiled the Plaintiff in the parking lot for several hours. See EXHIBIT C-27:
   "We had been receiving updates throughout the day regarding RICHARD KIRKHAM (A1)'s whereabouts, that he had been in the Motorhome WA/CHG3357 at the Silver Reef Casino parking lot..."

**7.82** To justify deploying SWAT in furtherance of the conspiracy to violate the Plaintiff's Fourth Amendment rights, Defendant Almer claimed BPD did not have resources to arrest the Plaintiff while he was in the parking lot. See EXHIBIT C-1.

**7.83** Almer's claim the BPD did not have resources was false: as soon as he decided to call in resources for a SWAT operation, he had them. See EXHIBIT C-6, C-9, C-11, C-13, C-16, C-18, C-21, C-23, C-25, C-26, C-28, C-29, C-30, C-31.

**7.84** The exhibits noted above in ¶7.83 are reports from 14 different BPD Officers who were all immediately available upon contact, many reported being called by Almer personally, many reported also being at home or off duty: these reports prove Almer was dishonest about available resources.

**7.85** Almer conspired with Harper and Aspessi to wait until the Plaintiff drove home, and falsely reported not having resource available in furtherance of his part in the Defendants' conspiracy to use excessive force against the Plaintiff, because he knew if they arrested him in the Casino parking lot the Casino's cameras would capture the incident. See EXHIBIT C-1, C-28.

**7.86** Almer also knew that he could not claim circumstances warranting SWAT deployment if the Plaintiff was in his RV rather than in his home. See EXHIBIT C-1—C3.

**7.87** Almer's deployment of SWAT under the circumstances is further evidence of BPD's de facto policy of unreasonably and negligently deploying SWAT.

**7.88** After being fully briefed of the totality of the circumstances, Defendant Mertzig consented to SWAT deployment, providing further evidence of the BPD's de facto policy of unreasonably and negligently deploying SWAT.

**7.89** On information and belief, national standards and best practices for police executing arrest warrants favor taking suspects into custody after they leave their homes, or by pulling them over before they have the opportunity to reach their homes, to prevent defensible positions, hostage situations, access to weapons, and more.

**7.90** In 2011 the Defendant was arrested for murder; Skagit County detectives employed best practices, waiting for the Plaintiff to exit his home, enter his vehicle, and drive away before pulling him over and taking him into custody.

**7.91** Almost every BPD Officer involved in the September 28, 2023, incident claimed they were familiar with the Plaintiff's criminal history, and therefore it can be inferred they knew his 2011 arrest, and that it was safest for everyone to not allow the Plaintiff to reach his home. See EXHIBITS C-2, C-6, C-9, C-11, C-13, C-16, C-18, C-21, C-23, C-26, C-28, C-29, C-30.

**7.92** Defendants Almer, Harper, and Mertzig knew that best practices for police favored pulling the Plaintiff over and arresting him before he reached his home, and they intentionally allowed

him to drive home in furtherance of all named Defendants' conspiracy to violate his Fourth Amendment rights.

7.93 Defendants Almer and Harper were specifically notified when the Plaintiff left the Casino parking lot mobile in his RV and they both made the affirmative decision to allow him to drive to his home, exit his vehicle, and enter his home without attempting to arrest him, thereby creating danger in furtherance of the conspiracy to violate his Fourth Amendment rights, which was the proximate cause of the Plaintiff's injuries. See EXHIBIT C-1, C-28.

7.94 Only after the Plaintiff was home could Almer and involved BPD Defendants claim factors in existence to justify their SWAT deployment and subsequently execute the second part of their coordinated conspiracy, which was to employ excessive force and assault and batter the Plaintiff using police munitions, military tactics, and a K9.

7.95 Almer and Harper allowed the Plaintiff to reach his home so they could claim the following factors existed warranting SWAT deployment:
• Plaintiff was familiar with the structure;
• Plaintiff had barricaded himself in the structure;
• Plaintiff was believed to have firearms in the structure;
• The surrounding area included a child care center, residential homes, an elementary school, businesses, and city parks;
• Officers would likely face an armed barricade situation;
• Plaintiff would have a tactical advantage over responding officers;
• Plaintiff would have knowledge and line of site [sic] to other non-involved/innocent potential targets;
• The surrounding neighborhood was linked by vehicle thoroughfares;
• Officers could face an armed hostage taking situation because the whereabouts of Rose were not known;
• Plaintiff would have an initial tactically advantageous, defensible position which could place numerous community members at risk;
• Deploying SWAT would allow the arrest of Plaintiff in the safest manner possible and offer a greater chance of a peaceful resolution.
See EXHIBIT C-2—C-3.

7.96 On information and belief, if Almer, Harper, or Mertzig believed any of those things were true they would have never allowed the Plaintiff to drive to and enter his home.

7.97 None of the factors alleged by Almer, as noted above at ¶7.96, were present when the Plaintiff was in his RV in the parking lot.

7.98 Defendants had no information that the Plaintiff was a present risk to anyone, that he was armed in his RV, that Rose was in the RV as a potential hostage, or that he was a flight risk.

7.99 On September 28, 2023, numerous objectively more reasonable alternatives to arresting the Plaintiff existed; a phone call asking him to report to FDS for an ankle monitor check; a call

from probation requesting a random UA; a call from the Sheriff's Office asking him stop by; blocking the RV in with police vehicles and asking him to step out.

**7.100** The fact that Defendants allowed the Plaintiff to drive home then claimed factors warranting SWAT deployment proves their conspiracy against the Plaintiff.

**7.101** Defendants Sturlaugon and Bean were team leads and devised an arrest plan to forward the conspiracy to assault and batter the plaintiff in violation of his Fourth Amendment rights to be free from unreasonable seizures and excessive force. See EXHIBIT C-19, C-23.

**7.102** On information and belief, it is common knowledge and included in police and SWAT training that stealth and the element of surprise are critical elements of a SWAT operation, which is why SWAT teams wear all-black or camouflaged uniforms depending on the environment, and use hand signals rather than audible verbal commands, and both Sturlaugson and Bean were aware of this.

**7.103** On information and belief, it is common knowledge and included in SWAT training that Officers are required to announce themselves as police and give lawful commands before employing any kind of force against an arrestee absent exigent circumstances, and both Sturlaugson and Bean were aware of this.

**7.104** On information and belief, it is common knowledge that blipping a siren invokes a flight response in most Americans, even those not guilty of any crime, and both Sturlaugson and Bean were aware of this.

**7.105** In furtherance of the conspiracy, Sturlaugson and Bean planned:
- To not identify the SWAT team as police;
- To not tell the Plaintiff he was under arrest;
- To not issue lawful commands to the Plaintiff;
- To startle the Plaintiff by blipping a Police siren, knowing it would induce his flight response;
- To immediately open fire without warning;
- To deploy a K9 Officer against the Plaintiff without warning;
- To commit violence and criminal assault against the Plaintiff in any way they could;
- To alter their BWC footage as necessary cover for their excessive force and criminal assault, avoid accountability, and interfere with the Plaintiff's First Amendment rights;
- To submit false reports to support the altered BWC footage and avoid accountability, and further interfere with the Plaintiff's First Amendment rights.

**7.106** Defendant Almer approved the arrest plan as outlined above at ¶7.105, and Sturlaugson and Bean communicated the plan to all named BPD Defendants, with the exception of potentially Mertzig.

**7.107** Nothing in Almer's, Sturlaugson's, or Bean's reports indicate that the arrest plan they devised was not followed, or that any officer did something other than what they has been told to do. See EXHIBIT C-1—C-5, C-18—C-20, C-23—C-24.

**7.108**  On September 28, 2023, the Plaintiff was in his driveway in front of his home, on his knees, in open view of the road which was 10 feet away, repairing parts on his RV, and voluntarily wearing a GPS ankle monitor.

**7.109**  The Plaintiff did not know he was wanted by police, and he had no intention of fleeing, as evidenced by his presence at his home, his working in open view, and the GPS ankle monitor he continued to wear.

**7.110**  Defendants Haas, Jobandeep, Woodward, Edgar, Sturlaugson, and Longbottom all reported that when they approached the Plaintiff's house they saw him on his knees in his driveway, as stated above at ¶7.108. See EXHIBIT C-7, C-9, C-14, C-16, C-19, C-21.

**7.111**  Sturlaugson reported that Defendants knew the Plaintiff was unaware of their presence, specifically stating that Haas pointed this out. See EXHIBIT C-19.

**7.112**  Given the circumstances, reasonable officers would have known the best course of action to ensure the Plaintiff's safety and take him into custody peacefully was to quietly surround him and announce something to the effect of:
"Mr. Kirkham. Police. We have a warrant for your arrest!"

**7.113**  Sturlaugson reported he authorized use of force if the Plaintiff was noncompliant or in active flight. See EXHIBIT C-19.

**7.114**  Sturlaugson did not report that he or any other Defendants gave the Plaintiff anything to comply with. See EXHIBIT C-18—C-20.

**7.115**  No other Defendants reported issuing commands for the Plaintiff to comply with. See EXHIBIT C-1—C-29.

**7.116**  Sturlaugson, Team Lead for Alpha 2, gave a preplanned signal for Alpha 1, the team in BPD's armored vehicle, Rescue 1, to activate their siren with the intention of startling the Plaintiff and inducing flight, as part of their conspiracy to deploy police munitions, military tactics, and violence against the Plaintiff (hereinafter "conspiracy"). See EXHIBIT C-25, C-29.

**7.117**  Defendant Shannon, under Bean's supervision and upon Sturlaugson's signal, actively participated in the conspiracy by activating Rescue 1's siren prior to Alpha 2 making contact, as was predetermined, to startle the Plaintiff into running and then shoot at him and release the K9, thereby proximately causing the Plaintiff's injuries. See EXHIBIT C-25.

**7.118**  On September 28, 2023, the Plaintiff was on his knees in his driveway, unaware of police presence.

**7.119**  The Plaintiff heard a sound behind him and began to turn and saw unidentified armed soldiers wearing camouflage and masks and holding military weapons, not identifiable as police.

**7.120**  The Plaintiff had never experienced such a sight and it made him instantly afraid for his life and safety.

**7.121**  In the same moment the Plaintiff discovered the armed soldiers, a siren blasted and scared him and he jumped up and ran for his life.

**7.122**  At no point was there an announcement of "Police" or any commands given to the Plaintiff, and the Plaintiff did not know the unidentified armed soldiers were police.

**7.123**  All of this occurred in approximately 1 second.

**7.124**  On information and belief, activating a siren is a common police tactic used to induce a flight response so officers can justify employing force against arrestees, and this is what Defendants did in furtherance of their conspiracy.

**7.125**  Haas, Jobandeep, Woodward, Edgar, Sturlaugson, and Longbottom, all reported the Plaintiff jumped up and ran immediately following the activation of Rescue 1's siren. See EXHIBIT C-6, C-9, C-14, C-16, C-19, C-21.

**7.126**  Sturlaugson specifically acknowledged that the activation of the siren "caused RICHARD KIRKHAM (A1) to immediately jump up and sprint..." See EXHIBIT C-19.

**7.127**  Woodward stated the activation of the siren "appeared to startle RICHARD KIRKHAM (A1), who immediately stood up and fled..." See EXHIBIT C-14.

**7.128**  None of the Defendants reported that activating the siren was not part of the arrest plan known to all Defendants. See EXHIBIT C-1—C-29.

**7.129**  Defendants Haas, Jobandeep, Edgar, Sturlaugson, Longbottom, all report they heard someone yell "Police" or they believe they heard someone yell "Police." See EXHIBIT C-6, C-9, C-16, C-19, C-21—C22.

**7.130**  Woodward was present with the Defendants named above at ¶7.129, and did not report an announcement of "Police." See EXHIBIT C-14.

**7.131**  None of the BPD officers present reported that they, themselves, yelled out an announcement of "Police."

**7.132**  On information and belief, if no one claims to have yelled "Police" then no one could have heard it yelled.

**7.133**  On January 23, 2025, as a courtesy from his criminal defense attorney (the incident is not related to his criminal matters), the Plaintiff was allowed to view the BWC footage of Woodward from the incident, which Defendants uploaded to Axon.com or Evidence.com.

**7.134**  The BWC video and audio prove unequivocally that no officers present announced themselves as "Police" before attacking the Plaintiff.

**7.135**  As Team Lead for Alpha 2, Sturlaugson did not report that his arrest plan included designating someone to make an announcement of "Police" or issue lawful commands to the Plaintiff, because they were not part of the plan. See EXHIBIT C-18—C-20.

**7.136**  The Defendants' plan was to intentionally not announce "Police" or issue lawful commands to the Plaintiff, which was part of their conspiracy, and was done to avoid a situation where the Plaintiff might peacefully surrender.

**7.137**  In less than 1 second of the Plaintiff beginning to run in fear for his life and safety from the unidentified armed soldiers in masks and camouflage, Haas started shooting at the Plaintiff's back without warning.

**7.138**  Haas reported that the Plaintiff posed a serious imminent threat to ROSELTA KIRKHAM (V1) and the surrounding community, and so he opened fire at the Plaintiff's back to prevent his escape. See EXHIBIT C-7.

**7.139**  No evidence supports Haas's claims as stated above at ¶7.138, as Rose was in a safe place (See EXHIBIT B-8, C-1) and the Plaintiff had been living peacefully in the community, and was working peacefully in his driveway at the time of contact, posing no danger to anyone (See EXHIBIT C-7, C-9, C-14, C-16, C-19, C-21: Plaintiff working on his knees in the driveway.)

**7.140**  Haas knew the facts stated above at ¶7.139 and intentionally lied about the Plaintiff posing a danger to justify his unlawful use of force in furtherance of the conspiracy.

**7.141**  Haas did not issue any commands or give any warning before opening fire at the Plaintiff's back. See EXHIBIT C-7.

**7.142**  The BWC video the Plaintiff viewed indisputably proves that Haas shot at the Plaintiff without warning.

**7.143**  Haas shooting at the Plaintiff without warning was part of the plan and was done in furtherance of the conspiracy.

**7.144**  Being shot at by unidentified soldiers in masks and camouflage, now known to be Haas and the present BPD Defendants, caused the Plaintiff absolute terror, and put him in fear of grievous bodily injury and death; he did not know the bullets were drag-stabilized flexible baton rounds.

**7.145**  Being shot at by Haas continues to inflict irrational fears of loud noises, emotional distress, and fear of authority figures upon the Plaintiff to this day.

**7.146**  At this point what actually occurred has been intentionally lied about and distorted by Defendants as part of their conspiracy, as explained below.

**7.147** What actually occurred is that, within approximately 3 seconds of beginning to run for his life the Plaintiff ran into one of the Defendants (likely Jobandeep based on the reports: See EXHIBIT C-22), and was apprehended at his back gate.

**7.148** The Plaintiff was held by the Defendant, and, being up close the unidentified camouflaged soldier, the Plaintiff could see the word "Police" and their fatigues, and he stopped trying to run and did not resist arrest.

**7.149** Had the Defendants announced they were police and told the Plaintiff he was under arrest he would not have run, because he was out on more than $100,000 in cash bail, more than $700,000 in bonds, and was making every effort to save his business and nonprofit, as evidenced by his compliance with law enforcement as stated above at ¶7.55—7.61.

**7.150** Within approximately 1 second of being apprehended by the first Defendant, a second Officer took hold of the Plaintiff.

**7.151** Neither Officer gave the Plaintiff commands, tried to take him to the ground, or attempted to handcuff him.

**7.152** Without a word to one another, the Officers holding the Plaintiff began to walk him into his back yard, away from the front of the house and out of public view, and this put the Plaintiff in renewed fear for his life and safety as it was not normal police conduct.

**7.153** As the first two Officers walked the Plaintiff into his back yard, a third Officer took ahold of him from behind and joined the escort.

**7.154** The three Officers had walked the Plaintiff approximately 20 feet into his back yard when Defendant Woodward and his K9 Rudy hurried around from behind them on the Plaintiff's right side and proceeded to face them.

**7.155** Approximately 10 total seconds had passed from the moment the siren was activated at that point.

**7.156** None of the four Officers gave the Plaintiff commands, tried to take him to the ground, or attempted to handcuff him.

**7.157** Without a word to his fellow Officers, the Plaintiff, or Rudy, Woodward began waving and gesturing to Rudy in a manner intended to get Rudy to attack the Plaintiff.

**7.158** Rudy was confused at Woodward's silent commands, as the Plaintiff was not struggling and was standing with a group of her fellow Officers, and she did not respond immediately.

**7.159** The Plaintiff realized that Woodward was trying to get Rudy to attack him and this put him in great fear of grievous bodily injury, causing great emotional trauma, as the Plaintiff had been attacked by a K9 before.

**7.160**  Woodard had Rudy on a leash and he pulled up on it so Rudy would rear up, then he pushed her towards the Plaintiff while continuing his silent commands and hand gestures.

**7.161**  Woodward, Haas, Jobandeep, Edgar, Sturlaugson, and Longbottom were all intentionally silent during this portion of the attack on the Plaintiff, because they had planned in advance to edit their BWC footage to conceal their criminal actions as part of the conspiracy, and knew speaking would complicate that process.

**7.162**  As Rudy reared up, one of the Officers released Plaintiff's left arm and the Plaintiff put the arm out defensively.

**7.163**  Rudy bit down on the Plaintiff's left arm and the Plaintiff experienced immediate severe pain and agony.

**7.164**  The Plaintiff screamed in pain and said "What the fuck?!?!" incredulously and in disbelief that so many Officers were participating in the attack.

**7.165**  Rudy's attack thrashed the Plaintiff to the ground, and he was put in a prone position on his belly as Rudy tore at his arm.

**7.166**  Defendants Haas, Jobandeep, Edgar, Sturlaugson, and Longbottom all either participated in holding the Plaintiff or stood by and witnessed silently without intervening to protect the Plaintiff as Woodward employed Rudy to criminally assault and batter the Plaintiff in furtherance of the conspiracy.

**7.167**  Rudy chewed on the Plaintiff wildly, spinning and clawing and twisting, at one point spinning and kicking her hind legs so violently her hind claws cut the Plaintiff's lower back while he was prone on the ground, before she spun back around and continued to attack.

**7.168**  Defendants allowed Rudy to chew on and bite the Plaintiff for 20 to 30 seconds before removing her and handcuffing him.

**7.169**  The pain the Plaintiff endured during the K9 attack was some of the worst in his life, and he had begun to urinate himself while Rudy was allowed to chew on him before taking control of his bladder to avoid further humiliation.

**7.170**  Upon being stood up, the Plaintiff felt he might pass out from the pain he was experiencing, but he made himself stay alert out of fear Defendants were going to take him somewhere and execute him; he had never been so terrified.

**7.171**  Such was the Plaintiff's terror and fear that, as Defendants walked the Plaintiff out of his backyard and towards the front of his house, he saw neighbors, standers by, and uniformed officers, and he immediately began screaming for help:
  "Help me! They're going to kill me!!!"
  "Help me! They just attacked me with their dog for no reason!"

"Help! They just assaulted me!"
"Call the Police!!!"

**7.172**  As part of their conspiracy to cover up their criminal assault and battery of the Plaintiff, Defendants Almer, Haas, Jobandeep, Woodward, Edgar, Sturlaugson, and Longbottom all omitted the Plaintiff's terrified screams for help from their reports.

**7.173**  Defendants Haas and Edgar escorted the Plaintiff to Rescue 1, the Plaintiff screaming the whole way, and they did not report it. See EXHIBIT C-6—C-8, C-16—17.

**7.174**  Only Officer Kaiser, who was not present for the use of force, reported the Plaintiff's screams, albeit inaccurately. See EXHIBIT C-11.

**7.175**  The Plaintiff continued to scream to the neighbors for help until he was near the road and saw a uniformed officer coming towards him, Defendant Almer, and began yelling to him begging for help.

**7.176**  The Plaintiff asserted loudly and clearly to Almer as he approached that he has just been illegally assaulted by the Defendants and Almer cut him off, interrupting him to say aggressively and haughtily: "You're under arrest!" See EXHIBIT C-4.

**7.177**  After the Plaintiff was handcuffed to the back of Rescue 1, he continued to try to explain to Almer what had happened but Almer kept cutting him off to avoid statements which would incriminate his Officers from being recorded by his BWC, as part of the secondary conspiracy to interfere with and obstruct the Plaintiff's First and Fourteenth Amendment rights (hereinafter "secondary conspiracy"), in furtherance of the initial conspiracy.

**7.178**  On information and belief, excited utterances, like those coming from the Plaintiff, are considered highly reliable and law enforcement officers are trained to pay attention for such exclamations.

**7.179**  Almer ignored the Plaintiff's excited utterances and even interfered with Plaintiff's attempts to declare the criminal actions of his Officers; Almer refused to take a written report from the Plaintiff.

**7.1780**  Almer intentionally left the Plaintiff's allegations against his Officers out if his report, in furtherance of the secondary conspiracy. See EXHIBIT C-1—C-5.

**7.181**  Almer was hostile and standoffish, and the Plaintiff was in so much pain, that the Plaintiff gave up trying to report the criminal assault to Almer.

**7.182**  The Plaintiff was transported by ambulance to Saint Joseph's Hospital in Bellingham, Washington, for treatment of his injuries and was unknowingly administered fentanyl for pain, which made him dizzy and incoherent, unable to report the criminal assault to hospital staff.

**7.183** BPD Officer Kingery reported the Plaintiff told him he was in more pain than he had ever been in. See EXHIBIT C-34.

**7.184** Kingery reported he photographed the injury on the Plaintiff's lower back, sustained from Rudy's claws during her wild thrashing, as stated above at ¶7.167. See EXHIBIT C-34.

**7.185** The BWC footage Defendants have presented as authentic and unaltered inexplicably does not show how the Plaintiff received the fresh injury photographed by Kingery.

**7.186** The Plaintiff received the injury photographed by Kingery as a result of K9 Rudy's wild thrashing when her claws raked the Plaintiff's back as described above at ¶7.167, which the altered video failed to account for.

**7.187** Defendants intentionally omitted the cause of the injury on the Plaintiff's lower back from their use of force reports as part of their conspiracy to cover up their criminal acts and misconduct through their premeditated plan of altering the BWC footage and falsifying reports per BPD's de facto policies, which had the force of law on September 28, 2023, and proximately caused the Plaintiff's injuries.

**7.188** Plaintiff's arm injuries were so severe that doctors at Saint Joseph's determined they could not treat them and the Plaintiff was transported to Harborview Medical Center in Seattle, WA.

**7.189** The Plaintiff endured painful wound cleaning and procedures to treat his injuries for several hours which caused him continuous agony and required numerous fentanyl administrations.

**7.190** When he had a moment of clarity between fentanyl administrations the Plaintiff quietly asked a nurse to send a social worker or hospital officer to him so he could report the criminal assault; he did so when BPD Officers were not close to him for fear they would interfere with him reporting their crimes against him as Almer did.

**7.191** As requested, a social worker approached BPD Officers to speak with the Plaintiff, and Defendant Johnson turned her away without letting the Plaintiff speak with her, fulfilling his part in the secondary conspiracy, and helping his fellow officers avoid accountability for their criminal assault and battery. See EXHIBIT 33.

**7.192** Following treatment of his injuries the Plaintiff was transported to the Whatcom County Jail for booking, where he suffered horrific withdrawals from fentanyl, which he had never taken before.

**7.193** On information and belief, BPD told jail staff to not provide him with an official BPD Complaint form, because the Plaintiff asked several times and was not provided one.

**7.194** On or about September 29, 2023, as soon as the Plaintiff was coherent enough, he called friends on jail recorded phone calls and clearly stated how the BPD had criminally assaulted him,

as described herein; those calls, while unrelated, are available in the Plaintiff's criminal matters, in possession of the Whatcom County Prosecutor's Office and his criminal defense attorneys.

**7.195**  On September 30, 2023, the Plaintiff used the jail's inmate messaging system to send a message to his friend Serena Lindquist which described his severe pain and suffering. See EXHIBIT D-7.

**7.196**  On October 1, 2023, using a jail tablet, the Plaintiff sent an inmate request seeking an attorney, briefly describing how SWAT unlawfully assaulted him. See EXHIBIT D-1.

**7.197**  Between October 2 and October 20, 2023, the Plaintiff used the jail's inmate messaging system to send several messages to various friends seeking counsel, support, and oversight for the criminal actions of the SWAT Team Defendants who assaulted him. See EXHIBIT D-2—D-8.

**7.198**  In these messages, the Plaintiff described briefly what occurred, specifically that SWAT snuck up on him, did not announce or identify as "Police," startled him, opened fired at him, apprehended him, specifically did not take him to the ground, then deliberately assaulted him, just as described in detail herein above at ¶7.118—7.169. See EXHIBIT D-3, D-5, D-6, D-8.

**7.199**  Between September 30 and October 25, 2023, the Plaintiff made several jail recorded phone calls to various friends in which he discussed the details of how SWAT deliberately assaulted him, as detailed herein above.

**7.200**  On November 26, 2023, after requesting an official complaint form for almost 2 months, the Plaintiff sent a handwritten complaint to BPD Chief of Police, Defendant Mertzig, explaining how BPD SWAT deliberately assaulted him, just as detailed herein above.

**7.201**  On information and belief, the complaint to BPD was assigned OPR# 2023 RTT-204.

**7.202**  In the complaint to BPD, the Plaintiff assured Mertzig that BWC footage would verify his claims.

**7.203**  Mertzig knew the BWC footage had been altered by her Officers and/or employees, and she never responded to the complaint.

**7.204**  Mertzig approved and maintained the BPD's de facto policy of unreasonably and unnecessarily deploying SWAT to violate the Fourth Amendment rights of citizens, and sustained that policy through approving and maintaining the BPD's de facto policy of altering BWC footage to conceal the unlawful and criminal acts of the BPD.

**7.205**  Mertzig applied these de facto policies to the Plaintiff's complaint, giving them the force of law and depriving the Plaintiff of his First, Fourth, and Fourteenth Amendment rights, in furtherance of her role in the conspiracies against the Plaintiff, as detailed herein above.

**7.206**  In January, 2024, the Plaintiff filed a tort claim with the City of Bellingham, which was assigned Claim for Damages #2024-05.

**7.207**  In his Claim for Damages, the Plaintiff assured the City of Bellingham's Attorney that BWC footage would verify his claims.

**7.208**  On March 18, 2024, the City Attorney denied the Plaintiff's Claim for Damages stating that the evidence does not support his claims, which confused the Plaintiff and made him think the City Attorney was just covering for the BPD, because he knew what the BWC footage would show, even without having seen it.

**7.209**  In January, 2024, the Plaintiff sent a complaint to the Washington State Criminal Justice Training Commission (WSCJTC) detailing how BPD SWAT deliberately assaulted him as described herein above, and assuring the WSCJTC that BWC footage would verify his claims.

**7.210**  The Plaintiff's complaint was assigned WSCJTC #2024-0012663.

**7.211**  The Plaintiff's WSCJTC complaint was initially denied, and the Plaintiff appealed, painstakingly describing what the BWC footage would show.

**7.212**  The Plaintiff was determined to hold the Defendants accountable for their intentional and criminal assault and battery, and he asked his criminal defense attorney, Adrian Madrone, to allow him, as a courtesy, to view some of the BWC footage so he could swear that he had seen the video, and that it supports his claims.

**7.213**  This was a "courtesy" because the BWC footage was not related to any of the Plaintiff's criminal charges; the Plaintiff was not charged with resisting arrest, fleeing, absconding, or any other crime related to the September 28, 2023, BPD SWAT assault.

**7.214**  BPD Defendants conspired with Defendant Kooistra to specifically not charge the Plaintiff with crimes related to his September 28, 2023, arrest in furtherance of the secondary conspiracy to interfere with and obstruct the Plaintiff's exercise of his First and Fourteenth Amendment rights to seek redress of his grievances through the processes due him.

**7.215**  The Defendants did not charge the Plaintiff with resisting arrest, etc., to prevent the BWC footage from being subjected to professional scrutiny by the Plaintiff's attorneys, thereby exposing the Defendants' violations of the Plaintiff's constitutional rights and making the discovery of their evidence tampering more likely.

**7.216**  The Defendants' failure to charge the Plaintiff with resisting arrest is a deviation from how they had treated him in the months prior to the September 28, 2023, incident which can only be explained as an attempt to avoid accountability given the totality of the circumstances.

**7.217**  On or about February 27, 2023, BPD developed PC for resisting arrest against the Plaintiff which was filed under Bellingham Municipal Court Case No. 3A0305941.

**7.218** In that instance there was no alleged necessity to deploy munitions or a K9 Officer to gain compliance due to the Plaintiff's alleged resistance, and BPD Defendants still saw that he was charged.

**7.219** On August 28, 2023, BPD developed PC for resisting arrest against the Plaintiff under BPD Incident No. 23B52957.

**7.220** In that instance there was no alleged necessity to deploy munitions or a K9 Officer to gain compliance due to the Plaintiff's alleged resistance, and BPD Defendants still attempted to see that he was charged.

**7.221** On information and belief, these two instances show that if BPD can develop PC for resisting arrest against the Plaintiff, they will.

**7.222** On information and belief, the fact that BPD Defendants did not develop PC to charge the Plaintiff with resisting arrest in the objectively more egregious instance on September 28, 2023, provides a reasonable inference that they deliberately did not due so in furtherance of their conspiracies and to avoid accountability.

**7.223** On information and belief, the deployment of police munitions and apprehension by a K9 Officer necessarily indicates resisting arrest, and Defendants not developing PC for such a charge under the circumstances was done in furtherance of their conspiracy to cover up their criminal acts and misconduct.

**7.224** On January 23, 2025, with the assistance of defense counsel Adrian Madrone, the Plaintiff viewed the BWC footage he believes was originally produced by the BWC belonging to Defendant Woodward.

**7.225** The video begins with four to six members of the camouflaged BPD SWAT team approaching the Plaintiff's home on foot.

**7.226** The video shows the SWAT Officers stop in the Plaintiff's neighbor's yard, this being the moment they found the Plaintiff unawares and on his knees in his driveway.

**7.227** After several seconds a siren blasts and the exact same instant, within 1 second, Defendant Haas opens fire at the Plaintiff without warning, firing six to eight times in rapid succession, proving the plan was to startle the Plaintiff so SWAT could shoot at him, which also aligns with the "I enjoy fireworks" declaration regarding SWAT deployment in EXHIBIT A-18.

**7.228** The video's audio contains yelling, and the only discernible word to the Plaintiff was "Richard!"

**7.229** The video then shows officers running with K9 Rudy on her lead.

**7.230** The video audio contains no announcement of "Police," lawful commands, warnings that a K9 has or will be deployed, or any announcement that the Plaintiff is under arrest.

**7.231**  The video up to this point is authentic and unaltered, and supports the Plaintiff's factual assertions as stated herein above at ¶7.118—7.146.

**7.232**  The video following this point has been altered and replaced with fake, computer generated footage by Defendants in an effort to avoid accountability for their criminal actions, and in support of the conspiracies as described herein.

**7.233**  The Plaintiff has not seen all the BWC videos from all the Defendants who participated in the incident, but he knows that Defendants would not have altered only one camera angle because the others would still show their criminal acts and misconduct.

**7.234**  The Plaintiff does not know which Defendants performed the actual edits of the BWC footage, but asserts that the footage from Defendants Haas's, Woodward's, Jobandeep's, Edgar's, Sturlaugson's, and Longbottom's BWCs have all been similarly altered to match up to facilitate the conspiracies against the Plaintiff, and they all participated.

**7.235**  Though fake at this point, the fabricated portions still unquestionably prove excessive force by Haas, Jobandeep, Woodward, Edgar, Sturlaugson, and Longbottom, as it shows in sequence:
- The Plaintiff running through his gate and tripping;
- A Defendant diving on top of the Plaintiff;
- The Defendant on top of the Plaintiff not issuing any lawful commands;
- None of the other Defendants attempt to assist in controlling the Plaintiff;
- K9 Rudy released without warning;
- K9 Rudy allowed to attack the Plaintiff despite a Defendant having reasonable control of the Plaintiff on the ground;
- K9 Rudy allowed to attack the Plaintiff despite the presence of the named Defendants who could have taken the Plaintiff into custody using lesser force than a K9.

**7.236**  Though the events depicted in the portion of the video described above at ¶7.235 were fabricated by Defendants and never occurred, the Defendants asserting them as fact is equivalent to agreeing excessive force was employed, as K9 deployment was not the least amount of force necessary to control the Plaintiff in such circumstances, and was therefore excessive and unreasonable.

**7.237**  BPD Policy 4.25.4 (5) places the responsibility of downloading BWC recordings on the Officer who wore the BWC, and therefore the Plaintiff asserts that Defendants Haas, Woodward, Jobandeep, Edgar, Sturlaugson, and Longbottom all participated in altering the BWC footage and uploading fraudulent evidence in furtherance of the conspiracies against the Plaintiff and to avoid accountability for their criminal acts and misconduct.

**7.238**  Defendants Haas, Woodward, Jobandeep, Edgar, Sturlaugson, and Longbottom all authored and filed false police reports which support the unlawfully altered BWC video(s) they downloaded in furtherance of the conspiracies against the Plaintiff and to avoid accountability for their criminal acts and misconduct. See EXHIBIT C-6—C-10, C-13—C-22.

**7.239** Defendant Almer conspired with Haas, Woodward, Jobandeep, Edgar, Sturlaugson, and Longbottom to submit false reports in furtherance of the conspiracies against the Plaintiff and to avoid accountability for their criminal acts and misconduct. See EXHIBIT C-3—C-4.

**7.240** BPD's Policy 425.4 (5) and (6) pertaining to Body Worn Video Recorders, is a negligent and unconstitutional policy, and was a proximate cause of the Plaintiff's injuries because it allowed Defendants Almer, Haas, Woodward, Jobandeep, Edgar, Sturlaugson, and Longbottom to act with premeditation and impunity based on the knowledge they would have the opportunity to alter the BWC videos prior to downloading them.

**7.241** BPD's Policy 425 is a Policy of negligence, negligent supervision, and failure to protect, and was a proximate cause of the Plaintiff's injuries because it does not provide for oversight when downloading BWC recordings, indicating only that data from BWC's shall be downloaded prior to the end of an officer's shift, leaving virtually unlimited time for BPD Officers who commit crimes or misconduct to use video editing software to edit videos prior to downloading them, as was done in the Plaintiff's case.

**7.242** BPD's Policy 425 is a policy of negligent supervision because it renders the existence of audit logs meaningless, as the BWC videos do not need to be accessed or edited by corrupt officers following their download of already edited videos into BPD's systems.

**7.243** Defendants Mertzig and Almer approved of and maintained BPD Policy 425, knowing it was being used by those under their supervision to delay downloading incriminating BWC videos until such videos could be edited in furtherance of the conspiracies against the Plaintiff and the BPD's de facto policies of:
   **1.** Unreasonably and unnecessarily deploying SWAT to employ excessive force in violation of the Fourth Amendment using police munitions, military tactics, and K9s (See EXHIBIT A-4, A-7, A-18, B-2—4: showing prior unreasonable attempts to deploy SWAT, and the BPD's view of using police munitions as enjoying "fireworks"), and;
   **2.** Altering BWC videos and falsifying reports to cover up the criminal acts and misconduct of BPD Officers to interfere with and obstruct injured partys' First and Fourteenth Amendment rights.

**7.244** Mertzig is the Chief of Police and a policy maker for the City of Bellingham, and she approved of, implemented, and maintained the unconstitutional policies and practices described herein above, and had personal knowledge of the conspiracies against the Plaintiff, approved them, allowed them to occur, and assisted in covering for the acts of her subordinates.

**7.245** Almer is the Deputy Chief of Police and a policy maker for the City of Bellingham, and he applied the de facto policies and practices described herein above, and had personal knowledge of the conspiracies against the Plaintiff and participated in them.

**7.246** As a result of the policies of the City of Bellingham, the Defendants' conspiracies against the Plaintiff, and the actions of all named Defendants as described herein above, the Plaintiff suffered; extreme terror and fear of grievous bodily injury and death; grievous bodily injury to his left arm; significant injury to his knee and lower back; extreme pain and suffering resulting

from the necessary medical treatment of his injuries; severe pain and suffering for a period of several days following the assaults and battery which caused the injuries; opioid withdrawal following the discontinuation of pain medications administered as a result of the injuries caused by Defendants; great pain and suffering for a period of several weeks following the initial injuries; permanent harm and disfigurement to his left arm; severe mental and emotional distress, and; permanent trauma in the forms of enduring extreme fear of loud noises, enduring distrust of authority figures, and enduring stress and anxiety (all of these hereinafter cumulatively referred to as "injuries" for the sake of space).

## VIII. CLAIMS FOR RELIEF

**8.1**  The policy of the City of Bellingham, employed by Bellingham Police Department, of unreasonably and unnecessarily deploying SWAT to intentionally and with premeditation employ military tactics, police munitions, and excessive force against citizens, had the force of law and was the moving force which proximately caused the Plaintiff's injuries, in violation of his Fourth Amendment rights to be free from excessive force and unreasonable seizures.

**8.2**  The actions of Defendants Aspessi, Kooistra, Almer, and Harper conspiring to unreasonably deploy SWAT against the Plaintiff were done maliciously and sadistically with the intention of depriving the Plaintiff of the equal protection of the rights secured by the Fourth Amendment, and were the proximate cause of the Plaintiff's injuries.

**8.3**  The actions of Defendants Aspessi, Almer, Harper, and Mertzig conspiring to delay the apprehension of the Plaintiff until he reached his home so they could justify SWAT deployment were done maliciously and sadistically, in furtherance of their conspiracy with all other BPD Defendants to deprive the Plaintiff of the equal protection of the rights secured by the Fourth Amendment, created a danger to the Plaintiff and an unreasonable risk of serious harm and were the proximate cause of the Plaintiff's injuries.

**8.4**  The actions of Defendant Mertzig in approving SWAT deployment under the circumstances was unreasonable and negligent, created a danger to the Plaintiff and an unreasonable risk of harm, was done maliciously and sadistically with deliberate indifference to the Plaintiff's safety, and was the proximate cause of the Plaintiff's injuries, and constitutes the torts of negligence, the wanton infliction of pain, and outrage under the laws of Washington State, and resulted in the violations of the Plaintiff's Fourth Amendment rights.

**8.5**  The actions of Defendants Almer, Sturlaugson, and Bean in devising an arrest plan to startle the Plaintiff while simultaneously failing to identify as police or issue lawful commands were done maliciously and sadistically and with premeditation, in furtherance of their conspiracy with all other BPD Defendants to deprive the Plaintiff of the equal protection of the rights secured by the Fourth Amendment, and created a danger to the Plaintiff and an unreasonable risk of harm and were the proximate cause of the Plaintiff's injuries.

**8.6**  The actions of Defendants Almer, Sturlaugson, and Bean in devising an arrest plan which failed to include identifying the SWAT Team as police, issuing lawful commands, or giving the Plaintiff an opportunity to surrender, proximately caused the Plaintiff's injuries, and constitute

the torts of negligent supervision, negligence, and deliberate indifference to the Plaintiff's safety under the laws of Washington State.

**8.7**  The actions of Defendant Shannon and Bean in conspiring to activate the siren on the BPD's Rescue 1 vehicle with the intention of startling the Plaintiff and inducing his flight response was done maliciously and sadistically and with premeditation, in furtherance of the conspiracy to intentionally employ excessive force against the Plaintiff in violation of his rights secured by the Fourth Amendment, and intended to deprive him of the equal protection thereof, and was the proximate cause of the Plaintiff's injuries.

**8.8**  The actions of Defendants Nelson and Lyons conspiring to alter the threat assessment and thereby justify SWAT deployment on June 26, 2023, was done maliciously and sadistically with the intention of harming or killing the Plaintiff, pursuant the BPD's de facto policy of unreasonably deploying SWAT, and was done to deprive the Plaintiff of the equal protection of the rights secured by the Fourth Amendment, and constitute the torts of outrage and deliberate indifference to the Plaintiff's safety under the laws of Washington State.

**8.9**  The actions of Defendant Haas in requesting SWAT deployment on July 19, 2023, was done maliciously and sadistically with the intention of harming or killing the Plaintiff, pursuant the BPD's de facto policy of unreasonably deploying SWAT, and was done to deprive the Plaintiff of the equal protection of the rights secured by the Fourth Amendment and constitute the torts of negligence and deliberate indifference to the Plaintiff's safety under the laws of Washington State.

**8.10**  The actions of all named BPD Defendants in furtherance of their continuous conspiracy to deploy SWAT against the Plaintiff were done maliciously and sadistically with the intention of harming or killing the Plaintiff, and to deprive the Plaintiff of the equal protection of the rights secured by the Fourth Amendment, and were the proximate cause of his injuries, and constitute the tort of outrage under the laws of Washington State.

**8.11**  The actions of Defendants Haas, Woodward, Jobandeep, Edgar, Sturlaugson, and Longbottom of failing to identify themselves as police, issue lawful commands, or offer the Plaintiff a reasonable opportunity to surrender before initiating contact to arrest the Plaintiff, were done maliciously and sadistically and with premeditation, in furtherance of their conspiracy, with the intention of harming or killing the Plaintiff, and to deprive him of the equal protection of the rights secured by the Fourth Amendment, and were the proximate cause of his injuries, and constitute the torts of outrage and deliberate indifference to the Plaintiff's safety under the laws of Washington State.

**8.12**  The actions of Defendant Haas of shooting at the Plaintiff's back without identifying himself as police, issuing lawful commands, or warning the Plaintiff, were done maliciously and sadistically and with premeditation, in furtherance of the conspiracy to deprive him of the equal protection of the rights secured by the Fourth Amendment, with the intention of causing great bodily injury to the Plaintiff, and which placed him in immediate apprehension and fear for his life and safety, and was the direct cause of the Plaintiff's injuries, constituting excessive force in violation of the Fourth Amendment, and the torts of assault and battery, deliberate indifference to

the Plaintiff's safety, the intentional infliction of emotional distress, and outrage under the laws of Washington State.

**8.13**  The actions of Defendants Haas, Jobandeep, Edgar, Sturlaugson, and Longbottom, of apprehending the Plaintiff then walking him into his back yard and holding him so Woodward could assault and batter him with K9 Rudy were done maliciously and sadistically and with premeditation, in furtherance of the conspiracy to deprive him of the equal protection of the rights secured by the Fourth Amendment, with the intention of causing grievous bodily injury, and which placed him in immediate apprehension and fear for his life and safety, were the direct cause of the Plaintiff's injuries, and constitute excessive force in violation of the Fourth Amendment, and the torts of assault and battery, deliberate indifference to the Plaintiff's safety, the intentional infliction of emotional distress, and outrage under the laws of Washington State.

**8.14**  The actions of Defendants Haas, Jobandeep, Edgar, Sturlaugson, and Longbottom, of failing to intervene to protect the Plaintiff from the K9 assault and battery inflicted by Woodward, were done maliciously and sadistically and with premeditation, in furtherance of the conspiracy to deprive him of the equal protection of the rights secured by the Fourth Amendment, and was the proximate cause of the Plaintiff's injuries, and violated their duty to intervene under RCW 10.93.190 (1), and constitute the torts of willful neglect, breach of duty, and outrage under the laws of Washington State.

**8.15**  The actions of Defendant Woodward of employing K9 Rudy to attack the Plaintiff while he was in custody and not resisting was done maliciously and sadistically and with premeditation, in furtherance of the conspiracy to deprive him of the equal protection of the rights secured by the Fourth Amendment, with the intention of causing grievous bodily injury, and which placed him in immediate apprehension and fear for his life and safety, was the direct cause of the Plaintiff's injuries, and constitute excessive force in violation of the Fourth Amendment, and the torts of assault and battery, deliberate indifference to the Plaintiff's safety, the intentional infliction of emotional distress, and outrage under the laws of Washington State.

**8.16**  The actions of Defendants Haas, Jobandeep, Edgar, Sturlaugson, and Longbottom of failing to report the assault, battery, and excessive force employed against the Plaintiff by Woodward, were done with premeditation in furtherance of the conspiracy to deprive him of the equal protection of the rights secured by the First, Fourth, and Fourteenth Amendments, and were the proximate cause of the Plaintiff's injuries, and obstructed justice, and violated their duty to intervene under RCW 10.93.190 (2), and constitute the torts of willful neglect, breach of duty, and outrage under the laws of Washington State.

**8.17**  The actions of Defendant Almer of interfering with and interrupting the Plaintiff as he attempted to report the excessive force employed by the SWAT Team, and of failing to report the same, was done in furtherance of the conspiracy to deprive him of the equal protection of the rights secured by the First, Fourth, and Fourteenth Amendments, and proximately caused the Plaintiff's injuries, and violated his First Amendment right to seek redress of his grievances, and his Fourteenth Amendment right to due process of law, and obstructed justice, and violatyhis duty under RCW 10.93.190 (2), and constitute the torts of willfully negligent breach of duty, failure to supervise, obstruction of justice, and outrage under the laws of Washington State.

**8.18**  The policy of the City of Bellingham, employed by Bellingham Police Department, of falsifying reports and editing and fabricating BWC footage to avoid accountability for their premeditated crimes and misconduct, and to deprive citizens of the equal protection of the rights secured by the First, Fourth, and Fourteenth Amendments, had the force of law and was the moving force with proximately caused the Plaintiff's injuries, in violation of his First Amendment right to seek redress of his grievances, his Fourteenth Amendment rights to be free from excessive force and unreasonable seizures, and his Fourteenth Amendment right to due process of law.

**8.19**  The actions of Defendants Almer, Haas, Woodward, Jonandeep, Edgar, Sturlaugson, and Longbottom of applying BPD's de facto policy of falsifying reports and editing and fabricating BWC footage to avoid accountability for their premeditated crimes and misconduct were done maliciously and sadistically, in furtherance of the conspiracy to deprive the Plaintiff of the equal protection of the rights secured by the First, Fourth, and Fourteenth Amendments, and were the proximate cause of the Plaintiff's injuries, and violated his First Amendment right to seek redress of his grievances, and his Fourteenth Amendment right to due process of law, and obstructed justice, and constitute the torts of willfully negligent breach of duty, obstruction of justice, and outrage under the laws of Washington State.

**8.20**  The policy of the City of Bellingham, employed the the Bellingham Police Department, Policy 425: Body Worn Recording Devices, created the opportunity for Defendants to act with premeditation and impunity in assaulting and battering the Plaintiff while their BWCs were activated because Defendants knew the policy allowed them to edit and fabricate the incriminating videos after the fact and prior to downloading, and had the force of law and was the moving force which proximately caused the Plaintiff's injuries, and constitutes a policy of deliberate indifference, negligence, and failure to supervise, in violation of the rights secured by the First, Fourth, and Fourteenth Amendments.

**8.21**  The actions of Defendant Mertzig of approving of, implementing, maintaining, and employing the City of Bellingham's and Bellingham Police Department's unconstitutional and unlawful policies of; unreasonably and unnecessarily deploying SWAT; falsifying reports and editing and fabricating BWC footage to avoid accountability, and Policy 425: Body Worn Recording Devices, were the proximate cause of the Plaintiff's injuries and violated his First, Fourth, and Fourteenth Amendment rights, and constitute the torts of willfully negligent supervision, deliberate indifference, and outrage under the laws of Washington State.

**8.22**  The actions of Defendant Johnson of interfering with the Plaintiff's attempt to report the crimes and misconduct of his fellow employees were done maliciously and in furtherance of the conspiracy to deprive the Plaintiff of the equal protection of the rights secured by First, Fourth, and Fourteenth Amendments, and obstructed justice, and violated the Plaintiff's First Amendment right to seek redress of his grievances, and his Fourteenth Amendment right to due process of law, and constitutes the torts of obstruction of justice, breach of duty, and the intentional infliction of emotional distress under the laws of Washington State.

**8.23**  The actions of Defendants Haas, Woodward, Jobandeep, Edgar, Sturlaugson, and Longbottom, as depicted in their faked and altered portions of the BWC footage which they have

represented as genuine through the act of downloading said footage into the BPD's systems, of attacking the Plaintiff with K9 Rudy without warning, while the Plaintiff was on the ground with one Defendant on top of him, and with the five other Defendants immediately present to assist in controlling the Plaintiff, constitute excessive force in violation of the Fourth Amendment.


## IV. RELIEF REQUESTED

WHEREFORE, the Plaintiff respectfully requests this Honorable Court grant the following relief:

## A. ISSUE A DECLARATORY JUDGEMENT STATING THAT:

**1.** The City of Bellingham, by and through the Bellingham Police Department, has an unconstitutional policy and practice of unreasonably and unnecessarily deploying their Special Weapons and Tactical (SWAT) Team which creates an unreasonable risk of harm to the community and which violated the Plaintiff's rights under the Fourth Amendment of the United States Constitution.

**2.** The Bellingham Police Department's Policy 425: Body Worn Recording Devices, is unconstitutional as it creates an obvious opportunity for evidence tampering by officers to avoid accountability, thereby encouraging and enabling officers to act criminally and commit misconduct without fear of repercussions, and defeating one of the core purposes of body worn recording devices, and the policy was the proximate cause of the violations of the Plaintiff's rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution.

**3.** The Bellingham Police Department, under the supervision Chief Rebecca Mertzig, has developed and maintained unconstitutional policies, and an unconstitutional and dangerous culture of employing excessive force against citizens and falsifying reports and evidence to avoid accountability, which was the proximate cause of the violations of the Plaintiff's rights under the First, Fourth, and Fourteenth Amendments.

## B. ISSUE A MANDATORY INJUNCTION ORDERING DEFENDANT CITY OF BELLINGHAM OR THEIR AGENTS TO:

**1.** Immediately compile into a common digital file and download to a disc or flash drive the original video and audio recordings produced by the body worn recording devices of BPD Officers and BPD vehicle dashboard and/or outboard recording devices related to the September 28, 2023, arrest of the Plaintiff;

**2.** Immediately create and compile a complete, clear, and understandable documentary record of every video and audio recording file identified in paragraph B. 1. above by creating screenshots, copying files, or creating original documents, which include the following information;
- Complete file path of each recording;
- Download dates and times of each recording;
- Names of persons who downloaded or created the files or documents;

• Names of persons who accessed, moved, or copied the files, on what dates and times, and for what purposes;
• File sizes and types;
• Name and type of device used to generate each recording;
• Names of Officers or vehicles associated with each recording;
• Information regarding how to play the videos or view the files.

**3.** Mail the digital files and documents identified in paragraphs B. 1. and B. 2., without redaction, to the Plaintiff's agent and lawful power of attorney via certified mail at the following address:

Jay H. Solomon
201 Sea Pines Lane
Bellingham, WA 98229
(360) 739-9489
jayh.solomon@gmail.com

## C. AWARD COMPENSATORY DAMAGES IN THE FOLLOWING AMOUNTS:

**1.** $1,000,000 against Defendant City of Bellingham for unconstitutional policies which proximately caused the Plaintiff's injuries.

**2.** $500,000 jointly and severally against Defendants Mertzig and Almer for approving, maintaining, and employing the unconstitutional policies which proximately caused the Plaintiff's injuries, and their tortious state law violations.

**3.** $250,000 jointly and severally against Defendants Aspessi, Kooistra, Nelson, Lyons, Harper, and Haas for their roles in the conspiracies to unreasonably and unnecessarily deploy SWAT against the Plaintiff which proximately caused the Plaintiff's injuries and their tortious state law violations.

**4.** $250,000 jointly and severally against Defendants Almer, Sturlaugson, and Bean, for their roles in the conspiracies against the Plaintiff, and developing and executing the arrest plan which proximately caused the Plaintiff's injuries and their tortious state law violations.

**5.** $250,000 jointly and severally against Defendants Shannon, Haas, Woodward, Jobandeep, Edgar, and Longbottom for their roles in the conspiracies against the Plaintiff and participation in the excessive force employed which directly caused the Plaintiff's injuries.

**6.** $250,000 against Defendant Woodward for intentionally assaulting and battering the Plaintiff using K9 Rudy without cause and directly causing his injuries.

**7.** $100,000 against Defendant Haas for shooting at the Plaintiff without cause or warning and directly causing his injuries.

**8.** $100,000 jointly and severally against Defendants, Haas, Jobandeep, Edgar, Sturlaugson, and Longbottom for their failure to protect the Plaintiff and the state law torts they committed against him.

**9.** $100,000 jointly and severally against Defendants, Almer, Haas, Woodward, Jobandeep, Edgar, Sturlaugson, and Longbottom for falsifying reports and BWC videos to avoid accountability for causing the Plaintiff's injuries, and for their tortious state law violations.

**10.** $50,000 against Defendants Almer and Johnson for interfering with the Plaintiff's lawful attempts to report the crimes and misconduct of their fellow officer, and their tortious state law violations.

## D. AWARD PUNITIVE DAMAGES IN THE FOLLOWING AMOUNTS:

**1.** $50,000 against Defendant Woodward.

**2.** $25,000 against Defendant Haas.

**3.** $15,000 each against Defendants Mertzig, Almer, Aspessi, Kooistra, Nelson, Lyons, and Harper.

**4.** $10,000 each against Defendants Shannon, Jobandeep, Edgar, Longbottom, and Johnson.

## E. GRANT SUCH OTHER RELIEF AS IT MAY APPEAR THE PLAINTIFF IS ENTITLED.

## X. VERIFICATION

I, Richard Arthur Kirkham, do hereby swear and affirm under penalty of perjury pursuant to the laws of the United States of America, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Signed this _17th_ day of _JUNE_____, 2025, at Bellingham, Whatcom County, Washington.

Richard Kirkham #136451
Plaintiff, pro se
Interim Work Center
2030 Division Street
Bellingham, WA 98226

## XI. CERTIFICATE OF SERVICE

I, Richard Arthur Kirkham, do hereby certify that I caused to be served a true and correct copy of the foregoing document, including EXHIBITS A, B, C, and D, on attorneys for the Defendants who have already been served in this matter, by depositing the same in the institution's outgoing mail with prepaid postage addressed to:

Keating, Bucklin & McCormack, Inc., P.S.   AND To:  KAREN M. PHILLIPS, WSBA# 45305
1201 Third Avenue, Suite 1580                        210 LOTTIE STREET
Seattle, WA 98101                                    BELLINGHAM, WA 98225


Signed at Bellingham, Whatcom County, Washington.

Dated: JUNE 17, 2025

Richard Kirkham #136451
Plaintiff, pro se
Interim Work Center
2030 Division Street
Bellingham, WA 98226